# UNITED STATES DISTRICT COURT

for the

Central District of California

| | |
|---|---|
| In the Matter of the Search of:<br>Information associated with an account that is within<br>the possession, custody, or control of Uber<br>Technologies, Inc. | )<br>)<br>)<br>)<br>)    Case No.  2:23-MJ-5817 |

## APPLICATION FOR WARRANT BY TELEPHONE PURSUANT TO 18 U.S.C. § 2703

I, a federal law enforcement officer, request a warrant pursuant to Title 18, United States Code, Section 2703, and state under penalty of perjury that I have reason to believe that within the following data:

*See Attachment A*

There are now concealed or contained the items described below:

*See Attachment B*

The basis for the search is:

☑ Evidence of a crime;
☑ Contraband, fruits of crime, or other items illegally possessed;
☑ Property designed for use, intended for use, or used in committing a crime.

The search is related to a violation of:

| Code section(s) | Offense Description |
|---|---|
| 21 U.S.C. § 841(a)(1) | Distribution of, and Possession with Intent to Distribute, a Controlled Substance |
| 21 U.S.C. § 846 | Attempt and Conspiracy |

The application is based on these facts:

*See attached Affidavit.*

/s/
_____
*Applicant's signature*

Andrea Ferdinand, Special Agent, DEA
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: _____

City and State: _____

_____
*Judge's signature*

Hon. Margo A.  Rocconi, U.S. Magistrate Judge
_____
*Printed name and title*

AUSA: Jeremy K. Beecher (x5429)

**ATTACHMENT A**

**PROPERTY TO BE SEARCHED**

This warrant applies to information associated with the Uber account associated with:

(a)  Uber account display name: Laylah Wilcher, associated phone number: 562-440-0042, associated e-mail address: jayfeu47@gmail.com (the "SUBJECT ACCOUNT").

The SUBJECT ACCOUNT is within the possession, custody, or control of Uber Technologies, Inc., a company that accepts service of legal process at 1515 3rd Street, San Francisco, CA 94158 regardless of where such information is stored, held or maintained.

## ATTACHMENT B

## ITEMS TO BE SEIZED

### I. SEARCH PROCEDURES

1. The warrant will be presented to personnel of Uber Technologies, Inc. (the "PROVIDER"), which will be directed to isolate the information described in Section II below.

1. To minimize any disruption of service to third parties, the PROVIDER's employees and/or law enforcement personnel trained in the operation of computers will create an exact duplicate of the information described in Section II below.

2. The PROVIDER's employees will provide in electronic form the exact duplicate of the information described in Section II below to the law enforcement personnel specified below in Section IV.

3. With respect to contents of wire and electronic communications produced by the PROVIDER (hereafter, "content records," see Section II.9.a. below), law enforcement agents and/or individuals assisting law enforcement and acting at their direction (the "search team") will examine such content records pursuant to search procedures specifically designed to identify items to be seized under this warrant. The search shall extract and seize only the specific items to be seized under this warrant (see Section III below). The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques. The review of

the electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts.  Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized, copied, or disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

4.   The search team will not seize contraband or evidence relating to other crimes outside the scope of the items to be seized without first obtaining a further warrant to search for and seize such contraband or evidence.

5.   The search team will complete its search of the content records as soon as is practicable but not to exceed 120 days from the date of receipt from the PROVIDER of the response to this warrant.  The government will not search the content records beyond this 120-day period without first obtaining an extension of time order from the Court.

6.   Once the search team has completed its review of the content records and created copies of the items seized pursuant to the warrant, the original production from the PROVIDER will be sealed -- and preserved by the search team for authenticity and chain of custody purposes -- until further order of the Court. Thereafter, the search team will not access the data from the sealed

3

original production which fell outside the scope of the items to be seized absent further order of the Court.

7.   The special procedures relating to digital data found in this warrant govern only the search of digital data pursuant to the authority conferred by this warrant and do not apply to any search of digital data pursuant to any other court order.

8.   Pursuant to 18 U.S.C. § 2703(g) the presence of an agent is not required for service or execution of this warrant.

## II.   INFORMATION TO BE DISCLOSED BY THE PROVIDER

9.   To the extent that the information described in Attachment A is within the possession, custody, or control of the PROVIDER, regardless of whether such information is located within or outside of the United States, including any information that has been deleted but is still available to the PROVIDER, or has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the PROVIDER is required to disclose the following information to the government for each SUBJECT ACCOUNT listed in Attachment A:

a.   All contents of all wire and electronic communications associated with the SUBJECT ACCOUNT, limited to that which occurred from November 1, 2021, through January 31, 2022, including:

i.   All e-mails, communications, or messages of any kind associated with the SUBJECT ACCOUNT, including stored or preserved copies of messages sent to and from the account, deleted

messages, and messages maintained in trash or any other folders or tags or labels, as well as all header information associated with each e-mail or message, and any related documents or attachments.

ii.  All records or other information stored by the subscriber of the SUBJECT ACCOUNT, including address books, contact and buddy lists, calendar data, pictures, videos, notes, texts, links, user profiles, account settings, access logs, and files.

iii. All other records of communications and messages of any kind made or received by the user, including all chats, messages, and private messages, in any format and however initially transmitted, including stored, deleted, and draft messages, and including attachments and links, the history of any kind of messages or communications, and audio and video calling history, and where such records exist, the identity of any other user or account with which the SUBJECT ACCOUNT was connected;

iv.  All records (including content records and the stored application data) pertaining to any Uber services associated with the SUBJECT ACCOUNT, including:

(I)  Subscriber information including the user's name, email, phone number, date of account creation, account status, partial credit card number, expiration date, and zip code, IP address, user device information, user transaction history, and user profile picture;

(II) Trip information for trips from November 1, 2021, through January 31, 2022, including the amount charged to the user for the trip, the pick-up and drop-off locations for any given trip by latitude and longitude, and information about the rider and driver including names and ratings;

(III)   GPS location information from the mobile devices of drivers and riders on any given trip from November 1, 2021, through January 31, 2022;

(IV) Records of communications made on the Uber app from November 1, 2021, through January 31, 2022, including communications between riders and drivers, including the content of such communications, as well as sender and recipient information and the date and time of such communications; and

(V)   Customer service records including customer support communications from November 1, 2021, through January 31, 2022.

v.   All records (including content records and the stored application data) associated with the SUBJECT ACCOUNT pertaining to Location History and App Activity, including the source of the data, date and time, latitude and longitude, estimated accuracy, device and platform, inferences drawn from sensor data, and associated logs and user settings, including Timeline access logs and change and deletion history;

vi.  All records (including content records and the stored application data) associated with the SUBJECT ACCOUNT pertaining to all maps data, all custom maps, saved, starred, and privately labeled locations.

vii. All records pertaining to communications between the PROVIDER and any person regarding the SUBJECT ACCOUNT, including contacts with support services and records of actions taken.

b.  All other records and information, including:

i.  All subscriber information, including the date on which the account was created, the length of service, the IP address used to register the account, the subscriber's full name, screen name(s), any alternate names, other account names or e-mail addresses associated with the account, linked accounts, telephone numbers, physical addresses, and other identifying information regarding the subscriber, including any removed or changed names, email addresses, telephone numbers or physical addresses, the types of service utilized, account status, account settings, login IP addresses associated with session dates and times, as well as means and source of payment, including detailed billing records, and including any changes made to any subscriber information or services, including specifically changes made to secondary e-mail accounts, phone numbers, passwords, identity or address information, or types of services used, and including the dates on which such changes occurred, for the SUBJECT ACCOUNT.

ii.  All records related to authenticating the user of the SUBJECT ACCOUNT, including use of two-factor authentication or App passwords used to allow access via a mobile device and the identity of those devices accessing the SUBJECT ACCOUNT;

iii. All records relating to any settings applied by the user of the SUBJECT ACCOUNT to cause a message to expire, to require a recipient to insert a password value to read a message, to control a recipient's ability to forward a message, or to retract access to a message already sent.

iv.  All user connection logs and transactional information of all activity relating to the SUBJECT ACCOUNT described above in Section II.9.b., including all log files, dates, times, durations, data transfer volumes, methods of connection, IP addresses, ports, routing information, dial-ups, and locations, and including specifically the specific product name or service to which the connection was made.

**III. INFORMATION TO BE SEIZED BY THE GOVERNMENT**

10.  For each SUBJECT ACCOUNT listed in Attachment A, the search team may seize:

a.  All information described above in Section II.9.a. that constitutes evidence, contraband, fruits, or instrumentalities of violations of 21 U.S.C. §§ 841(a)(1) (distribution of, and possession with intent to distribute, controlled substances) and 846

(conspiracy to distribute controlled substances) (the "SUBJECT OFFENSES"), namely:

      i.  Records, documents, programs, applications or materials, SMS, iMessage, email communications or other text or written communications sent or received, or evidence of the absence of same, which relate to the SUBJECT OFFENSES;

      ii.  Audio recordings, pictures, video recordings or still captured images related to the SUBJECT OFFENSES;

      iii. Contents of any calendar, date book, or contact or buddy lists;

      iv.  Global Positioning System ("GPS") coordinates and other information or records identifying travel routes, destinations, origination points, and other locations, drivers and riders;

      v.   Information relating to who created, accessed, or used the SUBJECT ACCOUNT, including records about their identities and whereabouts;

      vi.  Information relating to or reflecting the identities of any co-conspirators in the SUBJECT OFFENSES, including their whereabouts, any Internet accounts or services used by such persons and any coordination efforts; and

    b.   All records and information described above in Section II.9.b.

**IV.  PROVIDER PROCEDURES**

11.  IT IS ORDERED that the PROVIDER shall deliver the information set forth in Section II within 10 days of the service of this warrant.  The PROVIDER shall send such information to:

    Special Agent Andrea Ferdinand
    Drug Enforcement Administration
    255 E. Temple Street, 17th Floor
    Los Angeles, California 90012
    Tel:   (213) 305-8926
    Fax:   (213) 894-6703
    Email:  Andrea.N.Ferdinand@dea.gov

12.  IT IS FURTHER ORDERED that the PROVIDER shall provide the name and contact information for all employees who conduct the search and produce the records responsive to this warrant.

## AFFIDAVIT

I, Andrea Ferdinand, being duly sworn, declare and state as follows:

### I.   INTRODUCTION

1.   I am a Special Agent ("SA") with the Drug Enforcement Administration ("DEA") and have been so employed since May 2017.  I am currently assigned to the Los Angeles Field Division, Enforcement Group 5 ("Group 5") Los Angeles, California, an enforcement group investigating narcotics trafficking and money laundering violations under Titles 18 and 21 of the United States Code.  I have received 19 weeks of specialized training in Quantico, Virginia, pertaining to narcotics trafficking, money laundering, undercover operations, and electronic and physical surveillance procedures.  I have been involved in numerous investigations dealing with the possession, manufacturing, distribution, and importation of controlled substances as a SA with DEA.  Based on my training and experience, I am familiar with narcotics traffickers' methods of operation including the distribution, storage, and transportation of narcotics and the collection of money proceeds of narcotics trafficking.  I am also familiar with methods employed by large narcotics organizations to thwart detection by law enforcement.

2.   I have also assisted in investigations into the unlawful importation, possession with intent to distribute, and distribution of controlled substances, as well as the related laundering of

monetary instruments and the conducting of monetary transactions involving the proceeds of specified unlawful activities and conspiracies associated with criminal narcotics and money laundering offenses.

3.    To successfully conduct these investigations, I have utilized a variety of investigative techniques and resources, including physical and electronic surveillance and the use of various types of informants and cooperating sources.  Through my training, experience, and continued interaction with experienced special agents, task force officers, and other investigators, I have become familiar with methods employed by narcotic traffickers in general, to smuggle, safeguard, and distribute narcotics, and to collect and launder narcotic-related proceeds.

## II. <u>PURPOSE OF AFFIDAVIT</u>

4.    This affidavit is made in support of an application for a search warrant for information that is within the possession, custody, or control of Uber Technologies, Inc., a rideshare mobility service as well as a food and package delivery service, headquartered at 1515 3rd Street, San Francisco, CA 94158 (the "PROVIDER"), for the following account:

a.    Uber account display name: Laylah Wilcher; phone number: 562-440-0042; e-mail address: jayfeu47@gmail.com (the "SUBJECT ACCOUNT"), as further described in Attachment A.

5.    This affidavit is made in support of an application for a warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), 2703(c)(1)(A) and 2703(d)[1] to require the PROVIDER to disclose to the government copies of the information (including the content of communications) described in Section II of Attachment B.  Upon receipt of the information described in Section II of Attachment B, law enforcement agents and/or individuals assisting law enforcement and acting at their direction will review the responsive information to locate the items described in Section III of Attachment B.  Attachments A and B are incorporated herein by reference.

6.    As described more fully below, there is probable cause to believe that information associated with the SUBJECT ACCOUNT constitutes or contains evidence, contraband, fruits, or instrumentalities of violations of 21 U.S.C. § 841(a)(1) (distribution and possession with intent to distribute controlled substances) and 21 U.S.C. § 846 (conspiracy and attempt to distribute and possess with intent to distribute controlled substances) (the "SUBJECT OFFENSES").

7.    The facts set forth in this affidavit are based on my personal observations, my training and experience, and information

---

[1] The requested warrant calls for both records containing content (see Attachment B paragraph II.9.a.) as well as subscriber records and other records and information that do not contain content (see Attachment B paragraph II.9.b.).

obtained from various law enforcement personnel and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested search warrant, and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only, and all dates and times are on or about those indicated.

### III. <u>STATEMENT OF PROBABLE CAUSE</u>

8. Based on my review of DEA and Long Beach Police Department ("LBPD") law enforcement reports of the incidents below, my conversations with other law enforcement officers, and my personal involvement in the investigation, I know the following:

**A. The Grand Jury Charges Juan Carlos GUTIERREZ by Indictment for Distribution of Fentanyl Causing the Death of S.R.**

9. On December 10, 2021, a 34-year-old male, victim S.R., was found dead inside his residence at a drug rehabilitation home in Long Beach, California, run by Safe Refuge. The Los Angeles County Coroner's Office subsequently ruled S.R.'s cause of death as "fentanyl toxicity."

10. On April 25, 2023, Juan Carlos GUTIERREZ was indicted in this district on one count of distributing fentanyl resulting in S.R.'s death, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(C). See <u>United States v. Juan Carlos Gutierrez</u>, Case Number 2:23-cr-197-SB. The same day, the Hon. Alicia G. Rosenberg, United States

Magistrate Judge, issued a warrant for GUTIERREZ's arrest on the charge in the indictment.

11.  On May 2, 2023, DEA agents executed the federal arrest warrant for GUTIERREZ at his residence in Montebello, California, and brought him to this Court for arraignment.  GUTIERREZ was ordered detained pending trial, which is set for January 30, 2024, before the Hon. Stanley Blumenfeld, Jr.

**B.   FEUSIER Delivered Fentanyl to S.R. via an Uber**

12.  During the course of the investigation, as described below, DEA agents and the Long Beach Police Department determined Jayleen FEUSIER obtained the fentanyl that caused S.R.'s death from GUTIERREZ and delivered it to S.R. by sending it to S.R. in an Uber rideshare she obtained.

13.  On December 14, 2021, Long Beach Police Detective Mark Sisneros obtained a search warrant signed by the Honorable Judge Chris Frisco of the Los Angeles County Superior Court authorizing the search of S.R.'s phone.

14.  On March 29, 2022, Detective Sisneros obtained search warrants signed by the Honorable Judge Laura Laesecke of the Los Angeles County Superior Court for FEUSIER's Facebook account (ID# 1382996424).

15.  I reviewed the contents of S.R.'s cell phone and FEUSIER's Facebook account records, which indicated a narcotics-business relationship between S.R. and FEUSIER.  Specifically, during my

5

analysis, I observed Facebook messages exchanged between S.R. and FEUSIER on the night of December 9, 2021, prior to S.R.'s fatal fentanyl overdose early on the morning of December 10, 2021. The Facebook messages detail S.R. contacting FEUSIER to purchase a small quantity of fentanyl, and FEUSIER arranging to send the fentanyl to him at the Safe Refuge drug rehabilitation home via Uber.

16.  The following Facebook message exchange between S.R. and FEUSIER took place on December 9, 2021, at approximately 6:00 PM:

|  |  |
|---|---|
| S.R.: | It wasn't as great as I thought it would be |
| S.R.: | I actually feel kinda dumb for doing it. |
| S.R.: | Nobody found out or anything I'm still in treatment |
| FEUSIER: | With fent[2]? How'd you get it |
| FEUSIER: | Hahahah damn that not a good rehab |
| FEUSIER: | I already know I'ma be using till im old |
| S.R.: | If I gave you money you wouldn't hook me up huh |
| S.R.: | Someone brought some in |
| S.R.: | I smoked some |
| S.R.: | That's a no lol |
| S.R.: | Well let me know. I'm not far I'm in long beach |
|  | . . . |

_____

[2] Based on my training and experience, I know that "fent" is common code language or slang for fentanyl.

```
FEUSIER:   If you sent it I can get it for you im on
           my way to my homies

FEUSIER:   But you have to be sure you want to or
           not

S.R.:      Can you come to LB tho?

S.R.:      Yeah I'm sure I gotta load money onto my
           card. And I'd need to just

FEUSIER:   After

FEUSIER:   You can send it cash app

S.R.:      Im gonna go to the gas station and do it
           real quick. Can I just get 50 tho? And then
           R u driving?

FEUSIER:   Yes I can get you that

S.R.:      Yeah I gotta load money to my cash app my
           bank won't let me send it to cash app
           anymore

FEUSIER:   Damn … gpay?

S.R.:      Hold up

S.R.:      I'm gonna go load it and send it

FEUSIER:   And where do I go in lb³

S.R.:      fuck their machine is down :(

S.R.:      Dammit

S.R.:      [Photo of a hand with cash]

S.R.:      If you wanna just give me a small amount
           I'll still hook you up with 60⁴ for the
           trouble
```

---

³ Based on my knowledge of this investigation, I believe FEUSIER is referring to "lb" as Long Beach, California, which is the location of the Safe Refuge rehabilitation home.

⁴ Based on my training and experience, I know that the street price of fentanyl at the time of this exchange ranged from $30 to $60 per gram. Accordingly, I believe that, in this message, S.R.

```
S.R.:      Yo

FEUSIER:   Damn

FEUSIER:   I'll see if he'll[5] do a front

FEUSIER:   I'll let you know

FEUSIER:   Hopefully

S.R.:      Just give me a little bit of yours and then
           go back and get more after you get the cash
           from me? Idk.

S.R.:      I don't need a shit load.

FEUSIER:   Can you buy an Uber gift card

FEUSIER:   And I'll hook you up then

FEUSIER:   Just for like 35

S.R.:      Hold up

FEUSIER:   And since he hooks it up I'll just go to
           you after and give you a good chunk

S.R.:      Shit I don't think they have those at this
           gas station :(

           . . .

S.R.:      Ok I got this dude to cash app me

S.R.:      Hold up

S.R.:      Ok I'm gonna cash app u 60 and leave
           another 20 for you outside. Just hook me up
           haha

S.R.:      What's your cash ap?

FEUSIER:   [Image of Cash app ID by the name of
           lorelei feu]

FEUSIER:   Ok then … so get you a gram?
```

---

originally offered $50 for the gram of fentanyl but later offered
$60 for the transaction to occur.

   [5] Based on my knowledge of this investigation, I believe FEUSIER
is referring to GUTIERREZ as "he."

```
S.R.:      Whatever lol
S.R.:      I just sent it. Who's cash app is that.
FEUSIER:   Mine.
FEUSIER:   It's my webcam name
           . . .
FEUSIER:   I just replied … ok im here at the connects
           waiting for him to come out I'ma go inside
           his pad and I'll send you a pic of your sac
           when he weighs it
FEUSIER:   And send me an address where to go
           After
```

17.  Based on my training and experience, I believe the above exchange between S.R. and FEUSIER represents the coordination of a narcotics transaction in which FEUSIER would sell S.R. a gram of fentanyl for $60, to be delivered to S.R. at the Safe Refuge rehabilitation home in Long Beach.  The messages on Facebook between S.R. and FEUSIER reference "fent," which is slang for fentanyl.  The messages also depict S.R. paying FEUSIER for the fentanyl using the Cash App.  Further, I believe when FEUSIER mentions "he" and her "connect," she is referring to GUTIERREZ.

18.  The following Facebook message exchange between S.R. and FEUSIER took place on December 9, 2021, at approximately 6:30 PM – roughly 30 minutes after the above exchange:

```
FEUSIER:   I feel shitty cuz you wanna get clean but I
           know how it is
FEUSIER:   So that's why I wanna help in that way
FEUSIER:   You know I love your ass no matter what
```

```
S.R.:        Ok so, I can't really be seen meeting
             anyone so I will need you to just drop it
             in front of this little gate in front of
             the house im in. But yo if you wanna chill
             one of these days I get passes on Sundays.
FEUSIER:     Ok sounds good
             . . .
S.R.:        And then I'll leave the 20 out there too if
             not I'll just give this dude[6] more cash and
             cash app you more.
FEUSIER:     Whichever is good
S.R.:        Let me get the addy
FEUSIER:     Kkk
             . . .
S.R.:        Any chance u could wrap in foil?
FEUSIER:     Kkk need a lighter and toot?
S.R.:        I need a lighter
S.R.:        728 Freeman Ave, Long Beach, CA 90804
S.R.:        [An image of the rehabilitation house S.R.
             was residing in]
S.R.:        This is the house. They own like all the
             houses on the block and have cameras. So
             just walk by all inconspicuous, and drop it
             on the side walk in front of the gate. But
             don't do it if there are people on the
             porch. Let me know before you get here tho
             for sure.
S.R.:        Whatever you do, don't go into the alley.
             they own all the houses there too.
```

---

[6] Based on my training and experience, I believe S.R. is
referring to GUTIERREZ as "him."

```
S.R.:      Try to just have him wait in the street or
           something.
S.R.:      Hey don't worry about a lighter. I don't
           wanna have to make you drop off more shit
```

19.   In the above exchange between S.R. and FEUISER, S.R. gives FEUISER the exact address, and a picture, of the Safe Refuge rehabilitation house he resided in and where the fentanyl was to be delivered.  S.R. also mentions that he needed a foil and lighter. Based on my training and experience, I know that a common method of consuming fentanyl is through inhalation, which involves fentanyl being burned on foil and inhaled through a cylinder tube thereafter. Further, S.R. mentions to FEUSIER that there are cameras around the houses in the area and that he wanted FEUSIER to be careful to avoid detection when delivering the fentanyl.  It should be noted that Safer Refuge surveillance cameras did, in fact, capture S.R. departing the rehabilitation home, approaching a vehicle, and moments later returning to the rehabilitation home.

20.   The following Facebook message exchange between S.R. and FEUSIER took place on December 9, 2021, at approximately 10:00 PM – several hours after the above exchange:

```
FEUSIER:    Ok so we ran into a problem but it's
            fixe[d] now .....will you be able to get
            out if I send the package through Uber[7]
FEUSIER:    I'ma send you a pic of the sac and im
            putting it in a t shirt in a bag the
            lighter and foil will be in there too
FEUSIER:    I will send you the drive
            . . .
S.R.:       Ok
FEUSIER:    If that addy is a burn send me another one
            like down the street or whatve
S.R.:       Damn dude wtf happened.
S.R.:       Ok let me give you one
FEUSIER:    Well he basically had to go back for more
            because he gave him the wrong stuff
S.R.:       750 Freeman Ave, Long Beach, CA 90804
FEUSIER:    Ok I'll send you the pic and drive
S.R.:       Alright then
S.R.:       I didn't even know you can do that
S.R.:       Uber?
FEUSIER:    Yes it's amazing
S.R.:       How long u think that will take. I'm taking
            a risk trying to go out there now cuz I
            told my friend[8] I was "meeting my
            girlfriend outside" and he was gonna cover
            for me but now he's asleep.
```

---

[7] Based on my training and experience, I know that Uber is a common way to deliver narcotics.

[8] Based on my knowledge of this investigation, I believe S.R. is referring to his/her roommate of the rehabilitation home as "friend."

```
S.R.:       But whatever. I'm sure I can get away with
            it. As long as it's not like midnight then
            I'll really be fucked.
S.R.:       I told my friend he just woke up so it's
            cool. He's just gonna keep a lookout for
            me. I told him my girl is dropping off a
            shirt lol.
FEUSIER:    [Two photos showing a small plastic bag
            containing a white powdery substance. The
            bag is placed on what appears to be blue
            paper and then placed into a small
            cardboard box]
FEUSIER:    It'll be in a shoe box wrapped up in my
            black shirt.
FEUSIER:    The foil will be in the box too
S.R.:       Dude thank you xx
            . . .
FEUSIER:    K I'll send you the drive once it leaves
S.R.:       Ty so much. I'm gonna send you another 20
            tomorrow aright
FEUSIER:    I'm on my way! Follow my ride
            https://trip.uber.com/SOW7ls2rMwJvX
```

   21.  In the above exchange between S.R. and FEUISER, FEUSIER
indicates that she used an Uber to deliver the fentanyl to S.R.,
details how the fentanyl would be packaged and sends an image of the
packaged fentanyl for confirmation purposes.  FEUSIER also sends
S.R. a link to Uber's website to allow S.R. to track the progress of
the delivery in real time.

22.   The following Facebook message exchange between S.R. and FEUSIER took place on December 9, 2021, at approximately 10:46 p.m. – roughly 45 minutes after the above conversation:

> FEUSIER:   It's on its way so keep an eye ….your
>            welcome m … and thank you!!! BE CAREFUL
>
> S.R.:   I will. I'll hit you up after I get it,
>         ok
>
> S.R.    Reacted ❤ to your message
>
> S.R.:   Thank you!!!
>
> S.R.    Aw your little shirt
>
> FEUSIER:   You can throw it if you want
>
> FEUSIER:   Hahahah but glad you got it

23.   Based on my training, experience and knowledge of this case, I believe S.R. indicates in the above messages his receipt of the fentanyl, as he states he had received FEUSIER's shirt, in which the fentanyl was packaged, and FEUSIER signals her awareness that S.R. received the fentanyl.

24.   On April 10, 2023, DEA agents and LBPD detectives conducted a Mirandized Interview of FEUSIER.  FEUSIER confirmed that she had obtained fentanyl from GUTIERREZ and sent it to S.R. via an Uber on December 9, 2021.

**C.   FEUSIER Used the SUBJECT ACCOUNT to Deliver the Fentanyl**

25.   On January 10, 2023, DEA Special Agent Scott Jenkins sought through a subpoena to the PROVIDER information regarding any account maintained with the PROVIDER, using FEUSIER's name, date of birth, phone number and address.

14

26.  The documents produced by the PROVIDER confirmed the existence of the SUBJECT ACCOUNT, with the display name "Laylah Wilcher," associated phone number 562-440-0042, and e-mail address of jayfeu47@gmail.com.

27.  Based on my knowledge of this investigation, the phone number of the SUBJECT ACCOUNT identified by Uber is FEUSIER's phone number.  Additionally, the associated e-mail address is composed of FEUSIER's partial first name and partial last name.  Based on the listed phone number and email address, as well as my knowledge of this case, I believe the SUBJECT ACCOUNT belongs to FEUSIER.

28.  Based on my training, experience and knowledge of this case, I believe FEUSIER utilized the SUBJECT ACCOUNT to deliver the fentanyl that contributed to S.R.'s fatal fentanyl overdose, and that she did so to avoid being seen delivering the fentanyl to S.R.

29.  Through this search warrant application, I seek information from Uber regarding the SUBJECT ACCOUNT that I believe will assist in confirming that FEUSIER used the SUBJECT ACCOUNT to deliver the fentanyl that caused S.R.'s death.  Further, I believe the information from Uber regarding the SUBJECT ACCOUNT will confirm FEUSIER's whereabouts at the time she sent the fentanyl to S.R. via an Uber.

30.  On approximately July 18, 2022, I sent the PROVIDER a preservation letter requesting that information associated with the

SUBJECT ACCOUNT be preserved for 90 days pursuant to 18 U.S.C. §
2703(f).

31.   Other than what has been described herein, to my knowledge
the United States has not attempted to obtain the contents of the
SUBJECT ACCOUNT by other means.

### IV. <u>BACKGROUND ON THE PROVIDER</u>

32.   Based on my training and experience, I know the PROVIDER
is an app-based rideshare mobility service, as well as a food and
package delivery service, and that it maintains data including, but
not limited to, the following:

a.   Subscriber information including the user's name,
email, phone number, date of account creation, account status,
partial credit card number, expiration date, and zip code, IP
address, user device information, user transaction history, and user
profile picture;

b.   Trip information including the amount charged to the
user for the trip, the pick-up and drop-off locations for any given
trip by latitude and longitude, and information about the rider and
driver including names and ratings;

c.   GPS location information from the mobile devices of
drivers and riders on any given trip;

d.   Records of communications made on the Uber app,
including communications between riders and drivers, including the

content of such communications, as well as sender and recipient information and the date and time of such communications; and

        e.  Customer service records including customer support communications.

33. Based on my training and experience, I know it is common for narcotics traffickers to utilize Uber to deliver narcotics in an effort to evade law enforcement.

34. Based on my training and experience, I understand that the PROVIDER ordinarily retains user data for seven years.

**V.   <u>CONCLUSION</u>**

35. For all the reasons described above, there is probable cause to believe that the account information and contents of the SUBJECT ACCOUNT will constitute or yield evidence of violations of the SUBJECT OFFENSES committed by FEUSIER.

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this _____ day of
November, 2023.


_____
HON. MARGO A. ROCCONI
UNITED STATES MAGISTRATE JUDGE